UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ROYAL & SUN ALLIANCE INSURANCE )
LIMITED,                        )
                               )
            Plaintiff,          )
                               )
       v.                       )        No. 1:24-cv-00390-SEB-MG
                               )
AIR GENERAL, INC.,              )
                               )
            Defendant.          )

**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Now before the Court is Plaintiff's Motion for Partial Summary Judgment [Ruling]

That the Montreal Convention Does Not Apply to Defendant and Denying All

Affirmative Defenses Relying Thereon [Dkt. 38].[1]  This lawsuit arises out of the loss due

to water damage of a shipment of pharmaceutical devices owned by an affiliate of

Johnson & Johnson, which shipment was insured by Plaintiff Royal & Sun Alliance

Insurance Limited ("Royal & Sun").  United Airlines contracted to perform international

carriage by air for Plaintiff's insured cargo and the shipment was allegedly damaged

during the time it was under the care of Defendant Air General, Inc. ("Air General"), a

cargo handling agent for United Airlines that operates a warehouse located on the

grounds of the Indianapolis International Airport.  After paying out the insurance claim

---

[1] Also pending before the Court is Plaintiff's Motion for Oral Argument on Pending Motion for Partial Summary Judgment [Dkt. 52].  Because we are able to reach our decision based on the parties' briefing of the matter, Plaintiff's request for oral argument is hereby <u>DENIED</u>.

1

for the damaged shipment, Royal & Sun has brought this action against Air General in

subrogation, alleging that Air General breached its contractual obligations when in

storing the pharmaceutical devices they were left uncovered outside of its warehouse,

allowing rain to destroy the shipment.

Air General maintains that the rights and liabilities of the parties and their agents

are governed exclusively by the Montreal Convention for the Unification of Certain

Rules for International Carriage by Air 1999 (the "Montreal Convention") such that

Royal & Sun's state law causes of action against Air General are all preempted by the

Convention.  Royal & Sun seeks summary judgment in its favor on Air General's

affirmative defenses based on the Montreal Convention on the grounds that the

Convention does not apply to the storage loss at issue.  For the reasons detailed below, we

DENY Plaintiff's Motion for Partial Summary Judgment.

## **Factual Background**

### **The Parties and the Shipment**

On July 21, 2022, a shipment of sterilized knee implant devices (the "Shipment")

owned by Royal & Sun's insured DePuy Orthopedics Inc. ("DePuy"), a Johnson &

Johnson ("J&J") affiliate, arrived at the Indianapolis International Airport after having

been transported from London Heathrow Airport pursuant to Master Air Waybill[2] No.

---

[2] A "waybill" is "[a] document acknowledging the receipt of goods by a carrier or by the shipper's agent and the contract for the transportation of those goods.  A waybill ordinarily records where the goods [are] being sent, how much they are worth, and how much they weigh." *Waybill*, Black's Law Dictionary (12th ed. 2024).  An "air waybill," specifically, is "[a] waybill for transportation of cargo by air," *id.*, and is a non-negotiable form mandated by the International Air Transportation Association.  Article 4(1) of the Montreal Convention provides

016-92605586 ("MAWB"), dated July 19, 2022, and issued by Kuehne + Nagel ("K+N") to United Airlines ("United"), an international air carrier.  Exh. 2 to Jones Decl.  K+N also issued to DePuy a House Air Waybill ("HAWB") regarding transportation of the Shipment from London Heathrow to Indianapolis International Airport that identified the Shipment as 15 pallets of "surgical instruments."  Exh. 1 to Jones Decl.

Defendant Air General is a warehouse operator with a storage facility located on the grounds of the Indianapolis International Airport where it stores cargo for various air carriers, including United, that are involved with both domestic and international cargoes.  Air General was hired by United to store the Shipment at its warehouse upon the cargo's arrival in Indianapolis until the Shipment was delivered to Depuy, the co-signee on the air waybill.

**The Air Waybills and K+N's Terms and Conditions**

The front side of the MAWB and the HAWB states in relevant part as follows:

Not Negotiable … It is agreed that the goods described herein are accepted in apparent good order and condition (except as noted) for carriage SUBJECT TO THE CONDITIONS OF CONTRACT ON THE REVERSE HEREOF (same applies to Electronic HAWBs) … THE SHIPPER'S ATTENTION IS DRAWN TO THE NOTICE CONCERNING CARRIER'S LIMITATION OF LIABILITY.  Shipper may increase such limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required.

Exh. 1 to Jones Decl.; Dkt. 48-3 at 2.

The back side of the MAWB and HAWB provides in relevant part as follows:

---

that "[i]n respect of the carriage of cargo, an air waybill shall be delivered."  Montreal Convention art. 4(1).

**NOTICE CONCERNING CARRIER'S LIMITATION OF LIABILITY**

If the carriage involves an ultimate destination or stop in a country other than the country of departure, the Montreal Convention or the Warsaw Convention may be applicable to the liability of the Carrier in respect of loss of, damage or delay to cargo.  Carrier's limitation of liability in accordance with those Conventions shall be as set forth in subparagraph 4 unless a higher value is declared.

**CONDITIONS OF CONTRACT**

1.      In this contract and the Notices appearing hereon: CARRIER includes the air carrier issuing this air waybill and all carriers that carry or undertake to carry the cargo or perform any other services related to such carriage. …

…

2.1     Carriage is subject to the rules relating to liability established by the Warsaw Convention or the Montreal Convention unless such carriage is not "international carriage" as defined by the applicable Conventions.

2.2     To the extent not in conflict with the foregoing, carriage and other related services performed by each Carrier are subject to:

…

2.2.2    provisions contained in the air waybill, Carrier's conditions of carriage and related rules, regulations and timetables … and applicable tariffs of such Carrier, which are made part hereof ….

Exh. 1 to Jones Decl.; Dkt. 48-3 at 3.

The front side of the MAWB and HAWB also provides:

GOODS HEREIN ACCEPTED FOR CARRIAGE ARE SUBJECT TO OUR GENERAL CONDITIONS OF CONTRACT.  A COPY MAY BE RETRIEVED FROM HOME.KUEHNE-NAGEL.COM/-/SERVICES/AIR-FREIGHT/TERMS-CONDITIONS OR YOUR NEAREST KUENE + NAGEL LOCATION.

Exh. 1 to Jones Decl.; Dkt. 48-3 at 2.  The K+N terms and conditions (the "K+N T&C"),

in turn, provide in relevant part as follows:

> These terms and conditions of service constitute a legally binding contract between the "Company" and the "Customer."  In the event the Company renders services and issues a document containing Terms and Conditions governing such services, the Terms and Conditions set forth in such other document(s) shall govern those services.

> **1. Definitions**

> (a) "Company" shall mean **Kuehne & Nagel, Inc.,** its subsidiaries, related companies, agents and/or representatives;

> (b) "Customer" shall mean the person for which the Company is rendering service, as well as its agents and/or representatives, including, but not limited to, shippers, importers, exporters, carriers, secured parties, warehousemen, buyers and/or sellers, shipper's agents, insurers and underwriters, breakbulk agents, consignees, etc.  **It is the responsibility of the Customer to provide notice and copy(s) of these terms and conditions of service to all such agents or representatives;**

> …

> (e) "Third parties" shall include, but not be limited to, the following: "carriers, truckmen, cartmen, lightermen, forwarders, OTIs, customs brokers, agents, warehousemen and others to which the goods are entrusted for transportation, cartage, handling and/or delivery and/or storage or otherwise.

Exh. 3 to Jones Decl. (emphasis in original).  The K+N T&C further provide:

> **4. No Liability for the Selection of Services of Third Parties and/or Routes.**  Unless services are performed by persons or firms engaged pursuant to express written instructions from the Customer, Company shall use reasonable care in its selections of third parties, or in selecting the means, routes and procedure to be followed in the handling, transportation, clearance and delivery of the shipment; advice by the Company that a particular person or firm has been selected to render services with respect to the goods, shall not be construed to mean that the Company warrants or represents that such person or firm will render such services nor does Company assume responsibility or liability for any action(s) and/or

inaction(s) of such third parties and/or its agents, and shall not be liable for any delay or loss of any kind, which occurs while a shipment is in the custody or control of a third party or the agent of a third party; all claims in connection with the Act of a third party shall be brought solely against such party and/or agents; in connection with any such claim, the Company shall reasonably cooperate with the Customer, who shall be liable for any charges or costs incurred by the Company.

*Id.* (emphasis in original).

**The Cargo Handling Services Agreement**

The Cargo Handling Services Agreement executed by United and Air General (the

"Agreement") provides in relevant part as follows:

A. United desires to outsource to [Air General] and engage [Air General] to handle and process, manifest, warehouse, screen, administer, and execute United's cargo operations at the location specified in this Agreement, and to that end, provide the requisite services, resources and support, all as described and specified in this Agreement and the Exhibits hereto ….

…

2.1 SERVICES AS TO UNITED CARGO.  [Air General] shall perform and provide the services, material, resources facilities (including warehousing facilities and ground equipment) together with all support necessary to load, unload, inspect, weigh, confirm, manifest, sort, store, warehouse, administer, protect, handle for shipment and delivery all United Cargo all as provided in this Agreement … and [Air General] shall be bound by and responsible for compliance with any such modifications, supplements, updates, revisions or changes within reason communicated by United to [Air General] in writing.

…

2.8    PROTECTION OF UNITED CARGO.  [Air General] shall make every reasonable effort to (A) protect United Cargo from inclement weather; (B) safeguard same from loss and damage due to other causes, whether natural or man-made; and (C) prevent unauthorized access to United Cargo.

…

6

11.  RELATIONSHIP OF THE PARTIES; INDEPENDENT
CONTRACTOR STATUS.

11.1  Nothing herein is intended or shall be deemed to constitute, create,
give effect to or otherwise recognize a partnership, joint venture, or formal
business entity of any kind or create a fiduciary, agency or similar
relationship between the Parties, and the rights and obligations of the
Parties shall be limited to those expressly set forth in this Agreement.

Dkt. 43-1 at 1, 3, 5, 11.

**Storage of the Shipment and Resulting Water Damage**

On July 21, 2022, the Shipment was brought to Air General's warehouse facility at

7899 S. Service Road, Suite E, Indianapolis, Indiana 46241 while awaiting customs

clearance and FDA approval.  Air General received the Shipment in external good order

and condition, and, upon receipt, informed K+N via email as follows:  "We have received

a shipment for you.  Last free day [for storage] is 07/25/22.  We will need customs

clearance, a delivery order, and an import fee of $80 in order to release freight."  Dkt. 40-

11.  Under United's tariff, United provides its customers with two days' worth of "free

time" storage and any remaining storage under United's carriage is charged as either

"standard" or "excess" storage, which begins to accrue after five days of standard storage.

*See id.*; Dkt. 40-13; Dkt. 43-5.

The fifteen pallets that made up the Shipment of surgical instruments received by

Air General consisted of 260 cartons containing 15,728 individual medical devices

packaged as follows:  The medical devices were wrapped in sterile wrappings and

contained in sealed plastic trays.  Those plastic trays were packaged inside paper boxes

wrapped in plastic.  The plastic-wrapped boxes, in turn, were packed into cardboard

7

crates on the pallets. Each pallet was wrapped in plastic on all four sides and on top. Upon receipt, Air General also wrapped the Shipment in a tarp and secured the tarp by placing pieces of wood on top, but that tarp subsequently blew off the Shipment and was not replaced. Matonis Dep. at 60.

At some point after the Shipment arrived,[3] Air General Station Manager Misty Matonis informed United's vendor, K+N, that the cargo would be stored outside because there was no room inside the warehouse. *Id.* at 21–25. The lack of space in Air General's warehouse was caused by K+N's delay in retrieving previous shipments that were being stored by Air General. Ms. Matonis testified that, based on email communications she had received after it was known that the Shipment would be stored outside, it was her understanding that United had expressed that it "would not be held liable for any damages due to weather."[4] *Id.* at 25–26. Ultimately, the Shipment was stored outside Air General's warehouse for a total of thirteen days, from July 21 to August 3, 2022, on

---

[3] Citing the deposition testimony of Air General Station Manager Misty Matonis, Plaintiff claims that Air General told K+N on July 21, 2022, the "same day" the Shipment arrived, that "there was no room inside its warehouse and thus the Shipment had to be stored outside." Dkt. 151 at 4. However, Ms. Matonis testified that she was "not sure … about the day" she notified K+N that the Shipment would be stored outside and that it was "hard to say" whether she notified K+N "when [the Shipment] first came in" but agreed that it "was toward the beginning" of the storage period and that it was "an ongoing discussion" with K+N. *Id.* at 25. It is therefore not clear the exact date on when Air General first told K+N that the Shipment would be stored outside.

[4] Ms. Matonis's testimony is consistent with a June 20, 2023 email sent by United Cargo Claims and Loss Prevention to K+N in response to K+N's claim for damage, stating that, at some point during the period that the Shipment was stored outside Air General's warehouse, "UA operational management communicated with KN that UA would not be responsible for any weather damage due to the inability to pick-up the cargo." Dkt. 40-15.

which date the Shipment cleared customs and Air General tendered the cargo to a

trucking company, Jett Express, for transportation to J&J in Mooresville, Indiana.

During the period that the Shipment was stored outside, there was intermittent rain

from July 24 through August 2, 2022, with the heaviest downfall coming on July 26,

when 0.9 inches of rain fell.  Air General admits that the exterior packaging of the

Shipment became "wet at some point" due to the rain and that "the Shipment was wet

when tendered to Jett Express" on August 3, but "denies that the Shipment was moldy."

Dkt. 40-6.  Upon receipt of the Shipment on August 5, 2022, DePuy marked the cargo as

"BOXES CRUSHED AND WET.  POSSIBLE INTERNAL DAMAGE."  Dkt. 40-20.

Ultimately, J+J determined that the Shipment, valued at nearly $7 million, was covered in

mold, that it was a total loss, and had to be discarded.  *See* Exh. 1 to Gillespie Decl. ¶¶

3.17, 4.07; Romine Decl. ¶¶ 4–5 and Exh. A to Romine Decl.

**Communications Regarding Storage of the Shipment**

In internal communications from July 25 to July 28, 2022, Air General employees

discussed options for protecting the Shipment and other cargo that Air General was

storing outside its warehouse.  Specifically, the employees discussed the possibility of

seeking permission from the Indianapolis International Airport to rent or purchase an

"ocean container" for outdoor storage, and, in the meantime, planned to order "several

different sizes of heavier tarp with bungee cords" for further protection, observing that

Air General was otherwise at "too much risk for damaged freight."  Dkt. 40-17.  There is

no evidence that either of these protective measures was taken by Air General, however.

Air General did not contact J&J or DePuy at any point to inform them that the Shipment was exposed to the elements and had suffered water damage. According to Ms. Matonis, "[i]t is the stated policy of United Airlines" that Air General must perform a "360 degree inspection observing any signs of damage or loss" of each shipment "[a]nd if any of those signs are indicated, [Air General must] complete and file with United a United damage report." Matonis Dep. at 26–27; 52–54. United's policy "very firmly states that [Air General] [is] not to advise a customer if there [are] any damages to the shipment." *Id.* at 65–67.

Air General did advise K+N on the morning of July 26, 2022, that Air General's storage facility was "at 220% capacity" and that seven of K+N's shipments had collected "[a]lmost $15,000 in storage and excess storage … due to United as of this writing." Dkt. 43-6 at 4. Air General requested that K+N "advise when cleared shipments will be recovered as soon as possible." *Id.*

United followed up with K+N later that day at 5:19 p.m., requesting K+N's "urgent attention and assistance" to provide "an update on how soon the KN Team can please come and recover your import cargo" given that Air General's warehouse was "beyond capacity" and additional shipments were "scheduled to arrive soon." *Id.* at 3. Approximately one hour later, at 6:21 p.m., United again emailed K+N with the subject line: "RE: URGENT ATTN NEEDED: Multiple Shipments in UA Storage." The email stated as follows:

**PRIORITY**

K&N-IND Team,

Our IND station Manager has advised that they currently have some of your import freight staged in the backyard due to the facility being over capacity. Rain is in the forecast for IND beginning at 0200 tonight and continuing throughout the day tomorrow so it's pretty urgent your team retrieve what you can asap. Could you please ensure the correct import contacts in your office are made aware? If you have any questions, please feel free to reach out to Air General at the following. Thank you so much.

*Id.* at 2. The record is not clear whether K+N responded to this email, but it is undisputed that K+N did not retrieve the Shipment at any point while it was stored outside Air General's warehouse.

**The Instant Litigation**

In this lawsuit, Royal & Sun, as J&J's and DePuy's subrogee, seeks to hold Air General liable for the damage to the Shipment under breach of contract, breach of bailment, and negligence theories. Air General contends that Royal & Sun's claims are preempted by the Montreal Convention. Royal & Sun's motion for partial summary judgment on Air General's affirmative defenses based on the Montreal Convention is now fully briefed and ripe for ruling.

<u>**Legal Analysis**</u>

**I.    Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the

nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II.    The Montreal Convention

The Montreal Convention "applies to all international carriage of persons, baggage or cargo performed by aircraft for reward." The Convention for the Unification of Certain Rules for International Carriage by Air, Done at Montreal May 28, 1999 ("Montreal Convention"), art. 1(1), 1999 WL 33292734, at *29. The Convention makes a carrier liable for damage or destruction of cargo if "the event which caused the damage … took place during the carriage by air." *Id.* art. 18(1), 1999 WL 33292734, at *34. The Convention defines "carriage by air" as "the period during which the cargo is in the charge of the carrier." *Id.* art. 18(3).

When the Convention applies, "any action for damages, however founded, whether under this convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention …." *Id.* art. 29, 1999 WL 33292734, at *38. With regard to "servants and agents" of air carriers, the Convention provides: "If an action is brought against a servant or agent of the carrier arising out of damage to which the Convention relates, such servant or agent, if they prove they acted within the scope of their employment, shall be entitled to avail themselves of the conditions and limits of liability which the carrier itself is entitled to

invoke under this Convention." *Id.* art. 30(1). Although the Convention does not define "agents," some courts addressing this issue have held that an entity is an agent of an air carrier if it "perform[s] services in furtherance of the contract of carriage" or "services within the scope of the Convention that the airline is otherwise required by law to perform." *In re Air Disaster at Lockerbie, Scotland on Dec. 21, 1988*, 776 F. Supp. 710, 714 (E.D.N.Y. 1991) (citation omitted).

Under the Convention, "[a] carrier may stipulate that the contract of carriage shall be subject to higher limits of liability" or "to no limits of liability whatsoever," but may not agree to a lower limit of liability than what is provided for in the Convention. Montreal Convention art. 25, 26, 1999 WL 33292734, at *37. The Convention does not prohibit "the carrier from refusing to enter into any contract of carriage, from waiving any defences available under the Convention, or from laying down conditions which do not conflict with the provisions of [the] Convention." *Id.* art. 27.

## III.    Discussion

Royal & Sun argues that it is entitled to summary judgment on each of Air General's affirmative defenses that are based on the Montreal Convention—specifically, the third through eleventh defenses—because United contracted out of the Convention's protections for all third parties engaged in storage, such as Air General, and, even if the Court finds otherwise, the Montreal Convention does not protect Air General because the Shipment was not damaged during "carriage by air" as that term is defined in the Convention. Royal & Sun further argues that, even if the Court finds that the Montreal Convention applies to a portion of the time that Air General stored the Shipment, Air

General cannot prove what damage occurred during that period and what damage occurred thereafter. We address these arguments in turn below.

Royal & Sun first argues that the Montreal Convention does not apply here because the K+N T&C "directly incorporated into the United Airlines Air Waybill governing this loss, explicitly exclude and contract out of the charge of the carrier the work of any third party agent (such as Air General) involved in storing this cargo." Dkt. 39 at 10. Even assuming that the K+N T&C are incorporated into the MAWB signed between K+N and United, Royal & Sun's argument is not well-taken.

The K+N T&C explicitly state that they "constitute a legally binding contract between the 'Company' and the 'Customer,'" with "Company" defined therein as "**Kuehne & Nagel, Inc.,** its subsidiaries, related companies, agents and/or representatives," and "Customer" defined as "the person for which the Company is rendering service, as well as its agents and/or representatives …." Exh. 3 to Jones Decl. Royal & Sun relies solely on Section 4 of the K+N T&C to support its argument, which provides in relevant part that the "Company" does not "assume responsibility or liability for any action(s) and/or inaction(s) of … third parties and/or its agents, and shall not be liable for any delay or loss of any kind, which occurs while a shipment is in the custody or control of a third party or the agent of a third party; all claims in connection with the Act of a third party shall be brought solely against such party and/or agents …." *Id.* "Third parties" are defined in the K+N T&C as entities "to which the goods are entrusted for transportation, cartage, handling and/or delivery and/or storage or otherwise" including "carriers" and "warehousemen." *Id.*

14

Applying the definitions set forth in the K+N T&C to the situation at bar, the "Company" can only be K+N, the "Customer" must necessarily be Depuy, and United and Air General are "third parties."  Thus, Section 4 governs the liability of K+N, not United and/or its agents.  By signing the MAWB incorporating Section 4, United was at most acknowledging that K+N would not assume any responsibility or liability for actions or inactions of United and its agents in the event the cargo was damaged and Depuy brought a claim.  That provision cannot be interpreted as a waiver by United of any protections that it (as an air carrier) or its agents might have under the Montreal Convention, if a claim for damage to Depuy's cargo was brought against them.  For these reasons, we reject Royal & Sun's contention that by signing the MAWB incorporating the K+N T&C, United contracted away any limitation of liability afforded to it and its agents under the Convention.

Royal & Sun next argues that the Montreal Convention does not apply because the Shipment was not damaged during "carriage by air."  As discussed above, the Montreal Convention applies only when cargo is damaged during "carriage by air," which is defined under the Convention as "the period during which the cargo is in the charge of the carrier."  Montreal Convention art. 18(1), (3), 1999 WL 33292734, at *34.  Royal & Sun argues that the Shipment was not "in the charge of the carrier" at the time it was damaged because United had by that point expressly repudiated any obligation by it or Air General to assume responsibility for the cargo, thereby ending the period of air carriage.  *See* Dkt. 22 (*The Montreal Convention*, Leloudas *et. al*, ¶ 18.55 (2023) ("[A]

carrier is in charge of the cargo when it is able and willing to protect the cargo from any harm and assumes responsibility for its condition.")).

In support of this argument, Royal & Sun cites the fact that United has acknowledged that early in the period when the Shipment was stored outside Air General's warehouse, "[United] operational management communicated with [K+N] that [United] would not be responsible for any weather damage due to [K+N's] inability to pick-up the cargo." Dkt. 40-15. Royal & Sun argues that United's and Air General's subsequent failure to take any measures to protect the Shipment from weather damage beyond "a feeble attempt to put a tarp over the cargo," (Dkt. 47 at 9), further supports an interpretation of United's statement as an express repudiation of all responsibility for the Shipment by United and its contractor Air General that ended the period of air carriage.

We cannot conclude as a matter of law that United's statement constitutes a repudiation of its contractual obligations under the MAWB thereby ending the period of air carriage. Under Indiana law, "[r]epudiation of a contract must be positive, absolute, and unconditional in order that it may be treated as an anticipatory breach." *Angelone v. Chang*, 761 N.E.2d 426, 429 (Ind. Ct. App. 2001) (citation omitted). Similarly, under New York law, "[r]epudiation occurs when a breaching party's words or deeds are unequivocal. … The renunciation … must rise to the level of a clear and unqualified refusal to perform the entire contract." *Paradis v. Ghana Airways, Ltd.*, 348 F. Supp. 2d 106, 113 (S.D.N.Y. 2004), *aff'd*, 194 Fed. App'x 5 (2d Cir. 2006) (internal citations and quotations omitted). United's statement indicating that it would not be responsible for weather damage due to K+N's inability to retrieve the Shipment does not rise to the level

16

of repudiation of all responsibility for the Shipment under the MAWB, particularly considering that Air General has adduced evidence from which a reasonable jury could find that United and Air General continued to perform under the air waybill by covering the Shipment with a tarp and continuing to store the cargo until it was retrieved by Jett, the trucking company, for land transport to its final destination. We therefore must leave the factual question of whether United ended the period of air carriage when it indicated to K+N that it would not be responsible for weather damage to the Shipment and thus whether the cargo was damaged while "in the charge of the carrier" for resolution by the trier of fact.

Royal & Sun next argues that United's carriage by air and Air General's entitlement to protection under the Montreal Convention ended on July 25, 2022, the day on which United's "free time" storage expired and "standard" storage began, because at that point the Shipment was no longer being "stored in connection with the underlying [air] transportation" but was instead "being stowed for final delivery [via land transport] for the convenience of the shipper." Dkt. 39 at 20. Royal & Sun maintains that because the Shipment was damaged while being stored for an extended period solely to serve the cargo owner's needs (*i.e.*, until the Shipment cleared customs and FDA approval), the damage was not incurred "in relation to the carriage performed by the actual [air] carrier," as is required for the Convention's limitations on liability to apply and thus the loss is not covered by the Convention. Montreal Convention, art. 43.

It is undisputed that the damage to the Shipment occurred while it was stored outside Air General's warehouse located on the grounds of the destination airport

awaiting customs clearance and FDA approval before it could be transferred to the

trucking company for land transport to the consignee on the HAWB.  Although the parties

have not cited and we have not found a Seventh Circuit case directly addressing this

issue, in *Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v.*

*Expeditors Korea Ltd.*, 882 F.3d 1033 (11th Cir. 2018), the Eleventh Circuit Court of

Appeals, "[a]fter considering the negotiating history of the Convention, the conduct of

the parties to the Convention, and the weight of precedent in foreign and American

Courts," held that in order "to determine whether a period of storage in a warehouse

qualifies as carriage by land we must consider the specific facts and circumstances of the

storage to determine whether it was more closely related to the cargo's transportation by

air or by truck."  *Id.* at 1044.

In the closely analogous circumstances of *Underwriters at Lloyds*, the cargo "was

flown internationally on an airplane, offloaded from the airplane, transported to a carrier's

off-airport warehouse, delivered to a trucking company, and stored by the trucking

company in a separate warehouse before being loaded onto the truck for a multi-hour

journey to its final destination…."  *Id.* at 1048.  The Court highlighted the fact that, while

the precise time and location at which the damage to the cargo occurred was unknown,

the undisputed facts established that the damage had occurred outside of the airport,

while the cargo was in the possession of the trucking company, either while the cargo was

stored at the trucking company's off-site warehouse or during the trucking company's

transportation of the cargo by truck between Miami and Orlando, its final destination.  *Id.*

at 1038.  Thus, the Court determined that the Convention did not govern the loss because

"the warehouse storage at issue occurred as part and parcel of the last step of the cargo's journey, which was plainly carriage by land." *Id.* at 1048.

The facts in our case, while similar, are distinguishable from those at issue in *Underwriters at Lloyds*. Unlike in *Underwriters at Lloyds*, where the cargo was damaged outside the airport while in the possession of the trucking company that had contracted to perform land transport, it is undisputed that, in the case at bar, the damage to the Shipment occurred while the cargo was being stored by Air General, the air carrier's contractor, on the premises of the Indianapolis airport while awaiting customs clearance, prior to being transferred to the trucking company for land transport to the consignee. While "proof that the carrier 'has entrusted the delivery of goods to a trucker or other independent agency may be sufficient' to end the period of carriage by air, especially if that agency was not party to the original carriage contract," *Danner v. International Freight Systems of Washington, LLC*, No. RDB-09-3139, 2010 WL 3294678, at *5 (D.Md. Aug. 20, 2010) (collecting cases), here, the Shipment had not yet been transferred to the trucker when the damage occurred. Under these facts, a reasonable jury could find that the storage at issue is more akin to the Shipment's transportation by air than by land and that in storing the Shipment, Air General was acting as an "independent contractor[ ] acting in furtherance of the contract of carriage," *Underwriters at Lloyds*, 882 F.3d at 1043 n.14, such that the Convention governs.[5]

---

[5] Royal & Sun questions whether Air General can be considered an "agent" of United under the Convention given that the Cargo Handling Service Agreement governing their relationship denies the existence of agency status. However, we share the "doubt" expressed by the Eleventh Circuit Court of Appeals in *Underwriters at Lloyds* that "the agent/independent contractor

While Royal & Sun makes much of the fact that the damage occurred outside of United's "free time" storage period, we are aware of no bright line rule that the end of "free time" storage automatically ends the period of air carriage under the Convention. Rather, "the leading air transportation treatise" cited by Royal & Sun provides as follows regarding when storage no longer forms part of the period of carriage by air:

> The carrier no longer has charge of cargo and storage no longer forms part of carriage by air if the period of storage is indefinite and cannot be regarded as a temporary stage of the carriage. Cargo is no longer in the charge of the carrier if the purpose of the storage is to await further instructions rather than keep the cargo secure pending the next available transport. Where the consignee voluntarily delays the physical transfer of cargo for a long period, the carrier does not store the cargo under contract of carriage by air, but under a separate contract of warehousing since in these circumstances, the cargo ceases to be in the charge of the carrier upon its documentary transfer to the consignee.

Dkt. 40-23 at 4.

Without citation to any authority on this point, Royal & Sun claims that the thirteen days the Shipment was stored by Air General in this case "certainly" constitutes a "long period" of storage such that air carriage ceased as a matter of law. Dkt. 39 at 21. We are not so persuaded. There is no evidence here that the Shipment was to be held in storage indefinitely until the cargo owner provided further instructions. Rather, the

---

distinction is a salient one under the Convention," given that "[n]umerous [analogous] Warsaw Convention cases extended a carrier's liability to independent contractors acting in furtherance of the contract of carriage" and finding otherwise would permit carriers to "subvert" the Montreal Convention's "goal of uniformity by hiring such contractors in any situation where local laws would provide for less generous recovery than the Convention." 882 F.3d at 1043 n.14 (collecting cases). Because we find for the reasons detailed herein that Air General has adduced evidence from which a reasonable jury could find that it was acting as an independent contractor in furtherance of United's air carriage contract, the fact that the Cargo Handling Service Agreement explicitly states that Air General is not United's agent is not determinative.

evidence establishes that Air General was temporarily storing the Shipment until the cargo cleared customs and received FDA approval at which point Air General immediately transferred the Shipment to the trucking company for final delivery. A reasonable jury could find under these circumstances that the thirteen-day storage period during which the air carrier's contractor kept charge of the cargo formed part of the carriage by air, despite the damage having occurred outside the "free time" storage period.

For these reasons, we cannot hold as a matter of law that the Montreal Convention does not apply to the period of time that the Shipment was in storage outside Air General's warehouse and Plaintiff's motion for partial summary judgment must therefore be denied.[6]

## IV.    Conclusion

For the reasons detailed above, Plaintiff's Motion for Partial Summary Judgment [Dkt. 38] and Motion for Oral Argument on Pending Motion for Partial Summary Judgment [Dkt. 52] are <u>DENIED</u>.  The case shall proceed accordingly.

IT IS SO ORDERED.

Date:    _____12/29/2025_____        _Sarah Evans Barker_
                                         SARAH EVANS BARKER, JUDGE
                                         United States District Court
                                         Southern District of Indiana

---

[6] Because we hold for the reasons detailed herein that a reasonable jury could find that the entirety of the damage to the Shipment occurred during air carriage, we do not address Plaintiff's spoliation argument.

21

Distribution:

Bartholomew J. Banino
CONDON & FORSYTH, LLP
bbanino@condonlaw.com

Kipp Charles Leland
Maloof & Browne LLC
kleland@maloofandbrowne.com

David Thomas Maloof
Maloof & Browne LLC
dmaloof@maloofandbrowne.com

Eric C. McNamar
LEWIS WAGNER, LLP
emcnamar@lewiswagner.com

Jeffrey O. Meunier
Jeffrey O. Meunier
jom@mandmlawyers.com

Mirin E. Park
Condon & Forsyth LLP
mpark@condonlaw.com

Christopher Chase Wilson
Lewis Wagner, LLP
cwilson@lewiswagner.com